671 A.2d 1035

JOSEPH LOUIS PICOGNA, PLAINTIFF–RESPONDENT, v. BOARD OF EDUCATION OF THE TOWNSHIP OF CHERRY HILL AND PHILLIP ESBRANDT, DEFENDANTS–APPELLANTS, AND BARBARA RICHTERMAN, ELEANOR STOFMAN, ROBERT FREEDMAN, JEROME HAYM, FAITH JEROME, JAMES MARINO, DAVID MOLOTSKY, MARIANNE RAPHAELY, PAT CARROLL AND WILLIAM MCCARGO, INDIVIDUALLY AND/OR AS AGENTS AND/OR EMPLOYEES OF THE BOARD OF EDUCATION OF THE TOWNSHIP OF CHERRY HILL JOINTLY, SEVERALLY, AND IN THE ALTERNATIVE, DEFENDANTS.

Argued September 27, 1995—Decided February 22, 1996.

*Robert M. Tosti* argued the cause for appellants (*Rand, Algeier, Tosti & Woodruff,* attorneys; *Mr. Tosti* and *John F. McDonnell,* attorneys).

*John J. Finnegan, III,* argued the cause for respondent (*Finnegan and Barth,* attorneys).

The opinion of the Court was delivered by

·COLEMAN, J.

The critical issue raised in this appeal is whether a plaintiff who institutes litigation for breach of an employment contract is entitled to damages for litigation-induced stress. A second issue is whether an assistant superintendent of schools who is wrongfully terminated during the third year of a three-year employment contract acquired tenure.

We hold that litigation-induced stress is not recoverable as a separate component of emotional distress damages. We also hold that an assistant superintendent of schools does not acquire tenure under *N.J.S.A.* 18A:28–5(a) after working in a single school district for three consecutive calendar years unless he or she is reemployed by that district for at least one day.

I

Plaintiff, Joseph Picogna, was employed under a written contract with defendant Cherry Hill Board of Education (Board) as Assistant Superintendent for Business and Board Secretary for a three-year period beginning July 1, 1985, and ending June 30, 1988. In that capacity Picogna was responsible for spending district funds, approving the payment of vouchers of Board employees, and bidding and contracting on behalf of the Board. His contract provided that he could be terminated "forthwith" for cause, defined as misconduct, insubordination, or unauthorized absence. The contract also provided that "[o]n or before sixty (60) days prior to June 30, 1988, either party hereto may give written notice of the intention not to renew the employment relationship."

Picogna approached the responsibilities of his job with extreme seriousness and conscientiously supervised Board expenditures and adhered strictly to school policy. The trial court described Picogna as one who insured that the "I's were dotted and the T's were crossed."

At the time Picogna was hired, John McKeon served as Superintendent of Schools. McKeon retired in 1986 and was replaced

by defendant Philip Esbrandt. Although Esbrandt's first two evaluations of Picogna's performance were favorable, the relationship between Picogna and Esbrandt quickly deteriorated as Picogna made requests for documentation to support Esbrandt's expenditures and questioned Esbrandt's retention of school consultants. Esbrandt perceived Picogna's behavior as an attempt to interfere with his work and embarrass him personally and professionally.

Shortly after Esbrandt became superintendent, he set out to develop a record supporting a recommendation not to renew Picogna's contract, and ultimately, recommended terminating Picogna's existing contract. Esbrandt made false accusations against Picogna, charging him with various acts of misconduct including theft, conspiracy, and improper expenditure of tax dollars. He also accused Picogna of covering up the facts regarding a fatal school bus accident in the district.

Picogna was promptly notified by letter of Esbrandt's recommendation. A special meeting was held at which Esbrandt again recommended that Picogna's contract be terminated as of April 29, 1988, approximately two months before expiration of the contract. The Board voted accordingly and adopted a resolution ratifying Picogna's termination.

On July 6, 1988, Picogna instituted suit against Esbrandt, the Board, and the individual Board members. He alleged breach of contract, denial of tenure, deprivation of due process, violation of the Conscientious Employer Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, and tortious interference with his contract. Picogna sought reinstatement, an injunction restraining the continued violation of CEPA, compensatory and punitive damages, attorney's fees, and costs.

The trial court granted partial summary judgment, dismissing all claims against the Board except the breach-of-contract claim on the ground that plaintiff had failed to file a notice of claim required by the New Jersey Tort Claims Act, *N.J.S.A.* 59:8–8. The trial court also granted summary judgment in favor of the Board on the claim of tenure denial.

At the conclusion of a bench trial, the trial court dismissed all claims against the individual Board members, finding that they acted in good faith reliance on Esbrandt's evaluations when they voted to terminate plaintiff's contract. The trial court also found no CEPA violation. In addition, the trial court found that the Board terminated Picogna's contract without cause and that Esbrandt tortiously interfered with Picogna's contract. It found that Esbrandt, acting as agent, servant and employee of the Board, acted intentionally and maliciously to injure Picogna. Judgment for compensatory damages was entered against the Board and Esbrandt for economic damages of $750,000 and emotional distress damages of $560,000, which included recovery for Picogna's litigation-induced stress. The court assessed $50,000 in punitive damages against Esbrandt. In computing the economic damages, the trial court considered that Picogna would have received tenure but for defendants' actions, and arrived at a figure representing what Picogna would have earned until retirement reduced by variables such as the possibility of death, unemployment or early retirement.

The Board appealed, and the Appellate Division affirmed the trial court's finding of liability and the award of punitive and emotional distress damages but declined to discuss litigation-induced stress as a component of damages. A majority of the panel reversed and remanded the award of economic damages, finding that the calculation of damages over plaintiff's projected working life based on anticipated tenure was improper and that the lost wages awarded should have been based on net income rather than gross income. One member dissented, concluding that plaintiff was wrongfully deprived of tenure and that the trial court's calculation of economic damages was proper.

We granted defendants' petition for certification to address the appropriateness of an award of litigation-induced stress damages. 139 *N.J.* 443 (1995). Although plaintiff did not submit a cross-appeal based on the dissent, we will nonetheless address the issue

of whether plaintiff obtained tenure because of its importance to school districts throughout the State.

## II

Defendants argue that the trial court and the Appellate Division erred in compensating plaintiff for distress caused by the litigation itself. They assert that stress is a normal part of the litigation process and that only emotional distress associated with pretermination and termination events should be compensable. Plaintiff contends that because the present litigation was engendered by defendants' bad faith, *any* stress induced thereby should be compensable.

The trial court's award of $560,000 in emotional distress damages was based on many factors, including the stress resulting from the litigation. The court reasoned: "[T]he litigation was necessary because of the actions of the defendants. So they certainly can't be heard to argue that [plaintiff] shouldn't be compensated for the pain and suffering as a result of their conduct.... [P]art of that pain and suffering was generated as a result of the litigation."

As a preliminary matter, New Jersey recognizes the compensability of litigation-induced economic damages in the form of expenses in limited circumstances. Absent a court rule or an express statutory or contractual provision, a party may not recover litigation expenses in an action for damages. *N.J.S.A.* 2A:15–59.1; *R.* 4:42–9; *Cohen v. Fair Lawn Dairies, Inc.*, 86 *N.J.Super.* 206, 212, 206 *A.2d* 585 (App.Div.), *aff'd*, 44 *N.J.* 450, 210 *A.2d* 73 (1965); *Jersey City Sewerage Auth. v. Housing Auth.*, 70 *N.J.Super.* 576, 584, 176 *A.2d* 44 (Law Div.1961), *aff'd*, 40 *N.J.* 145, 190 *A.2d* 870 (1963). As a matter of policy, it is generally the responsibility of each litigant to pay the costs incurred in utilizing the judicial system.

Although New Jersey permits recovery for emotional distress damages in some cases, the potential for fabricated claims

justifies a requirement of enhanced proof to support an award of such damages. Under contract law, recovery is permitted where the breach of contract involves conduct that is both intentional and outrageous and proximately causes severe, foreseeable emotional distress. *Buckley v. Trenton Saving Fund Soc'y,* 111 *N.J.* 355, 364–66, 544 *A.*2d 857 (1988); *Fiore v. Sears, Roebuck & Co.,* 144 *N.J.Super.* 74, 76–77, 364 *A.*2d 572 (Law Div.1976); *Restatement (Second) of Contracts* § 353 (1981); 5 Arthur L. Corbin, *Corbin on Contracts,* § 1076, at 427 (1964). The "court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." *Buckley, supra,* 111 *N.J.* at 367, 544 *A.*2d 857; *see Strachan v. John F. Kennedy Memorial Hosp.,* 109 *N.J.* 523, 538, 538 *A.*2d 346 (1988) (permitting recovery of emotional distress damages against hospital for mishandling corpse); *Portee v. Jaffee,* 84 *N.J.* 88, 95–98, 417 *A.*2d 521 (1980) (permitting mother to recover emotional distress damages for witnessing her child's death); *Berman v. Allan,* 80 *N.J.* 421, 434, 404 *A.*2d 8 (1979) (permitting recovery of damages for mental and emotional anguish against a physician).

The present posture of our law permitting recovery in some circumstances for negligent or intentional infliction of emotional distress has been incremental. No reported decision to date, however, has decided whether litigation-induced stress should be recoverable as a component of damages. Stress and anxiety normally attend the litigation process. For this reason, the majority of courts addressing litigation-induced stress have treated it as a non-compensable component of damages regardless of whose actions necessitate the litigation. In declining to award litigation-induced emotional distress damages in a teacher's claim for sex discrimination against a public school, the Oregon Supreme Court observed:

The [mental suffering] of which [plaintiff] complains came about principally from the bringing of the legal proceedings and are the normal results of being a litigant.... She did not suffer any anxiety or emotional distress for which the law usually allows damages, since these types of stress are inherent in most litigation. It can be argued that she should not have been placed in a position where she had to assert her rights, but the same can be said of the successful plaintiff in any case.
[*School Dist. v. Nilsen,* 271 *Or.* 461, 534 *P.*2d 1135, 1146 (Or.1975).]

In other reported state court decisions, courts are virtually unanimous in holding that litigation-induced stress is not recoverable as a separate component of damages. *See, e.g., Buoy v. ERA Helicopters, Inc.,* 771 *P.*2d 439, 445 (Alaska 1989) (holding that trial court did not infringe on plaintiffs' right to litigate claims arising from helicopter crash when it permitted private defendant to argue that it was not liable for plaintiffs' litigation-induced depression); *Torres v. Automobile Club,* 41 *Cal.App.*4th 468, 43 *Cal.Rptr.*2d 147, 154 (1995) (finding in insurance coverage action no authority to support "the concept of recovery for the worry, bother and status of being 'upset' which normally attend any litigation"); *Pleasant v. Celli,* 18 *Cal.App.*4th 841, 22 *Cal.Rptr.*2d 663, 670 (1993) (holding in legal malpractice action that defendant attorney's actions prolonging underlying medical malpractice litigation did not give rise to damages for negligent infliction of emotional distress); *MacCharles v. Bilson,* 186 *Cal.App.*3d 954, 231 *Cal.Rptr.* 155, 157 (1986) (denying personal injury plaintiff additional damages for mental and emotional stress allegedly caused by having to disprove false affirmative defense asserted by defendant); *but cf. Jarchow v. Transamerica Title Ins. Co.,* 48 *Cal.App.*3d 917, 122 *Cal.Rptr.* 470, 491–92 (1975) (permitting insured to collect for litigation-induced stress against title company that refused to remove recorded encumbrance it negligently failed to discover in title search).

Similarly, federal court decisions are unanimous in holding that litigation-induced stress may not be recovered as damages. In a negligence action against a government employer, Judge Posner observed: "It would be strange if stress induced by litigation could be attributed in law to the tortfeasor. An alleged tortfeasor should have the right to defend himself in court without thereby multiplying his damages...." *Stoleson v. United States,* 708 *F.*2d 1217, 1223 (7th Cir.1983); *see Timms v. Rosenblum,* 713 *F.Supp.* 948, 955 (E.D.Va.1989), *aff'd,* 900 *F.*2d 256 (4th Cir.1990) (denying recovery for litigation-induced stress in legal malpractice case because mental anguish attends all litigation); *Clark v. United*

*States,* 660 *F.Supp.* 1164, 1200 (W.D.Wash.1987), *aff'd,* 856 *F.*2d 1433 (9th Cir.1988) (suggesting that although stress of litigation is caused by the underlying harm, pursuit of litigation is a matter of choice).

Both the state and federal cases reflect the view that because anxiety is an unavoidable consequence of the litigation process, it does not form a separate basis for recovery against one's opponent. Although the damages caused by the wrongful conduct induce the litigation, and hence the attendant stress, a plaintiff chooses to pursue litigation cognizant of both the economic and emotional costs that it will entail. Some of the stress is caused by a general distaste for litigation, and some by a plaintiff's vigorous participation in the litigation process. Yet the substantial emotional investment made by a plaintiff in a case is merely the normal result of being a litigant.

We hold, therefore, that plaintiff may not recover for litigation-induced distress as a separate component of damages. Plaintiff may, however, recover for severe emotional distress proximately caused by the pre-and post-termination events exclusive of the litigation.

Because the emotional distress damages award of $560,000 does not reflect the amount intended to compensate for litigation-induced stress, the entire amount must be vacated. The emotional distress damages must be recalculated without a litigation-induced stress element.

III

*A*

Our next inquiry is whether the deliberate breach of a contract of employment spanning a period of three consecutive calendar years confers tenure even though the employee is discharged before the employee serves the requisite period fixed by the tenure statute.

Although plaintiff has not filed a cross-appeal from the Appellate Division's reversal of the economic damage award of $750,000 as the economic equivalent of tenure, and did not appeal from the summary judgment dismissing his claim for a tenured position, he argues nonetheless that the trial court properly determined the economic damages based on the reasonable assumption that he would have acquired tenure but for the wrongful discharge. Defendants assert that the Appellate Division properly held that tenure should not have been considered in awarding damages.

■ Plaintiff's position is untenable on both procedural and substantive grounds. Prior to trial, the trial court granted summary judgment to the Board dismissing plaintiff's claim for tenure, thus removing the issue of tenure from the case. The trial court nevertheless concluded that plaintiff would have obtained tenure but for the wrongful termination, and awarded economic damages for plaintiff's projected working life. We agree with the Appellate Division that plaintiff did not acquire tenure.

Plaintiff was terminated without cause before serving the time required for tenure. Tenure is conferred by statute. *N.J.S.A.* 18A:28–5. Plaintiff would acquire tenure as assistant superintendent only *after employment* for any one of the following periods:

(a) three consecutive calendar years, or any shorter period which may be fixed by the employing board for such purpose; or

(b) three consecutive academic years, together with employment at the beginning of the next succeeding academic year; or

(c) the equivalent of more than three academic years within a period of any four consecutive academic years[.]

[*N.J.S.A.* 18A:28–5.] [1]

■ Tenure arises only upon compliance with the precise conditions articulated in the statute. *Zimmerman v. Board of Educ.,* 38 *N.J.* 65, 72, 183 *A.*2d 25 (1962), *cert. denied,* 371 *U.S.* 956, 83 *S.Ct.* 508, 9 *L.Ed.*2d 502 (1963); *see Nissman v. Board of Educ.,* 272 *N.J.Super.* 373, 377–81, 640 *A.*2d 293 (App.Div.), *certif. denied,*

---

[1] The statute was amended by *L.*1991, *c.* 267, § 3, effective August 24, 1991, but the changes do not affect this case.

137 *N.J.* 315, 645 *A.*2d 142 (1994); *Jamison v. Morris Sch. Dist.*, 198 *N.J.Super.* 411, 416–17, 487 *A.*2d 739 (App.Div.1985). Other jurisdictions construing similar statutes have reached the same conclusion. *Spicer v. Anchorage Indep. Sch. Dist.*, 410 *P.*2d 995, 998 (Alaska 1966); *Bessler v. Board of Educ.*, 69 *Ill.*2d 191, 13 *Ill.Dec.* 23, 26, 370 *N.E.*2d 1050, 1053 (1977); *McGee v. Humboldt County Sch. Dist.*, 93 *Nev.* 171, 561 *P.*2d 458, 459 (1977).

The objective of *N.J.S.A.* 18A:28–5 is to protect competent and qualified persons, after a probationary period, from removal for "unfounded, flimsy, or political reasons." *Zimmerman, supra,* 38 *N.J.* at 71, 183 *A.*2d 25. The statute defines with specificity the requirements plaintiff had to satisfy before he could acquire tenure. Because plaintiff failed to serve the requisite three years mandated by *N.J.S.A.* 18A:28–5(a), he did not acquire tenured status. *Canfield v. Board of Educ.*, 51 *N.J.* 400, 241 *A.*2d 233 (1968), *rev'g on dissent below,* 97 *N.J.Super.* 483, 490–93, 235 *A.*2d 470 (App.Div.1967); *Kletzkin v. Board of Educ.*, 261 *N.J.Super.* 549, 552, 619 *A.*2d 621 (App.Div.1993), *aff'd,* 136 *N.J.* 275, 642 *A.*2d 993 (1994); *Jamison, supra,* 198 *N.J.Super.* at 418, 487 *A.*2d 739.

In the dissenting opinion in *Canfield* that this Court adopted, Judge Gaulkin stated: "[T]enure and contract are two different concepts; tenure is statutory and arises only by passage of the time fixed by the statute, and the discharge of an employee before the passage of the required time bars tenure, even if the discharge is in breach of an employment contract which, if not breached, would have extended to a date which would have given tenure." *Canfield, supra,* 97 *N.J.Super.* at 490, 235 *A.*2d 470. That observation was cited with approval by Justice Stein in his dissent in *Kletzkin, supra,* 136 *N.J.* at 283–84, 642 *A.*2d 993, in which he agreed that tenure cannot be obtained without actual service of the time specified in the statute.

We reaffirm this Court's holding in *Canfield* that breach of a contract covering a full probationary period of employment that may have resulted in tenure had no breach occurred does not confer tenure in the absence of continued employment after

service for the requisite number of consecutive probationary years in the same district. To obtain tenure based on *N.J.S.A.* 18A:28–5(a), plaintiff was required to serve three consecutive calendar years on probation with defendant and then be reemployed by the Board for at least one day in a fourth year. *Zimmerman, supra,* 38 *N.J.* at 75–76, 183 *A.*2d 25. That is required to satisfy the statutory requirement of employment *after* expiration of three consecutive years. Although *N.J.S.A.* 18A:28–5(a) permitted the parties to agree on a shorter period, they did not. In addition, the Board's absolute right not to renew the employment relationship on sixty-days notice is compelling evidence that the parties did not intend to confer tenure upon entry into the contract or after substantial performance under the contract. No matter how substantial the likelihood that plaintiff would have obtained tenure, a wrongful termination that does not violate the State or federal anti-discrimination laws, will not result in tenure. *Zimmerman, supra,* 38 *N.J.* at 70–71, 183 *A.*2d 25.

### B

Although we have not been asked to decide what the appropriate standard should be to measure the economic damages in this case, we wish to make clear what standard the Appellate Division established. We neither approve nor disapprove that standard.

In the Appellate Division, defendants challenged the standard used by the trial court in computing economic damages. Defendants contended, among other things, "that Esbrandt, as an agent of the Board acting within the scope of his authority, could not be liable for interference with plaintiff's contractual relationship with the Board." The Appellate Division did not address that legal contention. Nor did the court's discussion of why economic damages may not be based on loss of tenure indicate whether economic damages related to Esbrandt's tortious interference with plaintiff's contract could or should be different from those related to the Board's breach of contract. Defendants did not raise that issue in the petition for certification. We note, however, that

Esbrandt's damages for tortious interference may differ from the Board's breach of contract damages. If that issue is raised on remand, or if plaintiff seeks to impose greater economic damages on Esbrandt than those imposed on the Board, the trial court must decide whether a conflict of interest exists in having the same attorney represent both the Board and Esbrandt.

The Appellate Division concluded that

plaintiff's claim for future damages or front pay should be limited to a reasonable time. We are satisfied that the award of future damages based on plaintiff's work life expectancy was error. We note that plaintiff obtained a similar but less salaried position with the Delran School District within three years of this termination. In addition, the favorable outcome of this litigation should remove any prior blemish on his record resulting from his termination and open up other employment opportunities for him. We find no reason to conclude that plaintiff may not achieve his former income level in the near future.

The Appellate Division found that the award of $750,000 in economic damages based on tenure was not contemplated by the contract. It also found that the award of economic damages based on plaintiff's working life expectancy was speculative and shocked the judicial conscience. The case was remanded to the Law Division "for a determination of a reasonable time period for future damages as part of the award of its economic damages. While we offer no precise limit for the reasonable time period, we are satisfied that under the circumstances of this case it was a mistaken exercise of discretion to award damages for the balance of plaintiff's expected work-life." We note further that in *Canfield* the contract damages were limited to sixty-days, the notice requirement for termination of the contract. *Canfield, supra,* 97 *N.J.Super.* at 492, 235 *A.*2d 470. We do not, however, suggest what the time limit should be.

## IV

Defendants contend that once the economic and emotional distress damages are vacated, the punitive damages should be vacated as well because they are intertwined with the other damages awarded.

This Court has consistently held that there is some linkage between compensatory and punitive damages. *Herman v. Sunshine Chem. Specialties, Inc.,* 133 *N.J.* 329, 337–38, 627 *A.*2d 1081 (1993); *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 50, 477 *A.*2d 1224 (1984); *Leimgruber v. Claridge Assocs.,* 73 *N.J.* 450, 457–58, 375 *A.*2d 652 (1977). In *Fischer v. Johns–Manville Corp.,* 103 *N.J.* 643, 512 *A.*2d 466 (1986), the Court observed:

> Punitive damages should bear some reasonable relationship to actual injury, but we have consistently declined to require a set numerical ratio between punitive and compensatory damages. . . . The reasonableness of the relationship of punitive damages to actual injury must be considered in light of other factors in each case. For example, some particularly egregious conduct may generate only minimal compensatory damages. In such cases higher punitive damages would be justified than when substantial compensatory damages are awarded.
>
> [*Fischer, supra,* 103 *N.J.* at 673, 512 *A.*2d 466 (citations omitted).]

This historical relationship was codified recently by the Legislature when it enacted the Punitive Damages Act, *N.J.S.A.* 2A:15–5.9 to –5.14. The Federal Supreme Court, however, has held that the absence of such a relationship does not violate substantive due process under the Fourteenth Amendment. *TXO Prod. Corp. v. Alliance Resources Corp.,* 509 *U.S.* 443, 460–464, 113 *S.Ct.* 2711, 2721–23, 125 *L.Ed.*2d 366, 380–82 (1993); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 *U.S.* 1, 23–24, 111 *S.Ct.* 1032, 1046, 113 *L.Ed.*2d 1, 23 (1991).

Because the economic damages were vacated by the Appellate Division and we reverse the emotional distress damages, and because the punitive damages are intimately related to those compensatory damages, the punitive damages must also be redetermined.

## V

We reverse the emotional distress damages and vacate the punitive damages awards. The matter is remanded to the Law Division for a new trial on damages only.

*For reversal, vacation and remandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.